Receipt number AUSFCC-6073102

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **ASSOCIATED MORTGAGE BANKERS, INC.**, )<br>2395 Ocean Avenue, Suite 5, )<br>Ronkonkoma, New York 11779, on behalf of itself )<br>and a class of similarly-situated mortgage lenders, )<br> )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>**UNITED STATES OF AMERICA**; )<br> )<br>**BEN CARSON**, in his official capacity as )<br>Secretary of the U.S. Department of Housing )<br>And Urban Development, )<br>451 7th Street, S.W., )<br>Washington, D.C. 20410; and )<br> )<br>**U.S. DEPARTMENT OF HOUSING AND** )<br>**URBAN DEVELOPMENT**, )<br>451 7th Street, S.W., )<br>Washington, D.C. 20410, )<br> )<br> Defendants. )<br>_____ ) | Case No. **20-354C** |

## CLASS ACTION COMPLAINT

### INTRODUCTION

Plaintiff, Associated Mortgage Bankers, Inc. ("AMB"), brings this action on behalf of itself and a class of similarly situated lenders, for breach of contract and breach of the covenant of good faith and fair dealing against the U.S. Department of Housing and Urban Development ("HUD"). The underlying contract is an Indemnification Agreement between AMB and HUD. This action arose out of HUD's issuance of a Notice of Intent to Collect by Treasury Offset for $161,897.31 that the Agency claims is due and owing as a result of the Indemnification Agreement. As explained more fully below, however, HUD breached the Indemnification Agreement in numerous ways; accordingly, it is barred from enforcing the contract against AMB.

AMB filed a timely administrative appeal objecting to HUD's conduct.  On February 28, 2020, the HUD Administrative Law Judge ("ALJ") assigned to issue the final decision of the Agency ruled against AMB and directed the government to begin collecting the entire amount of HUD's claim via Treasury Offset.[1]

In addition, HUD has treated a number of other lenders in a similar manner.  In order to fix this misconduct – HUD's breaches of its indemnification agreements with other lenders – AMB, on behalf of itself and a class of similarly-situated lenders, brings this class action seeking restitution, disgorgement, declaratory, and injunctive relief against defendants the United States of America, Ben Carson, in his official capacity as Secretary of HUD, and HUD, for breach of contract and breach of the covenant of good faith and fair dealing.

## PARTIES

1.      AMB is incorporated under the laws of New York, with its principal place of business in Ronkonkoma, New York.

2.      AMB originates mortgage loans, including mortgages that are and were eligible for insurance under the Federal Housing Administration ("FHA") insurance program administered by HUD.

3.      AMB is and was at all times relevant to these allegations an FHA-approved mortgagee and subject to regulation by HUD.

4.      The United States of America is a governmental entity.

5.      Ben Carson is the Secretary of HUD, and he is named only in his official capacity.

---

[1] A copy of the ALJ's Decision and Order on Remand dated February 28, 2020 ("Decision"), is attached hereto as Exhibit 1.  That decision is separately under judicial review through the Administrative Procedure Act ("APA").  *See AMB v. Carson*, 1:20-cv-00744-ESH (D.D.C.).

6.      HUD is an agency of the United States government with its headquarters at 451 7th Street, S.W., Washington, D.C. 20410.

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491, as the Indemnification Agreement is an express contract between AMB and HUD.

## FACTUAL BACKGROUND

### *FHA Mortgage Insurance*

8.      FHA was created by Congress in 1934, and became part of HUD's Office of Housing in 1965.

9.      FHA provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories.

10.     HUD's website states: "FHA mortgage insurance provides lenders with protection against losses if a property owner defaults on their mortgage.  The lenders bear less risk because FHA will pay a claim to the lender for the unpaid principal balance of a defaulted mortgage. . . . FHA is the only government agency that operates from its self-generated income.  The Mortgage insurance premiums it collects from borrowers via lenders are used to operate the program."  *See* https://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory (last visited Mar. 10, 2020).

11.     The account from which FHA pays insurance claims is known as the Mutual Mortgage Insurance Fund (the "MMI Fund").

### *FHA Insurance Claims*

12.     When loans subject to FHA mortgage insurance default, the mortgage holder or servicer will generally foreclose on the property or obtain a deed-in-lieu of foreclosure.

13.     The mortgage holder or servicer will then generally make an insurance claim to FHA for its losses incurred in connection with the default on the mortgage and will convey title to the property to HUD in return.

14.     HUD will then generally dispose of any collateral it receives in exchange for paying an insurance claim from the MMI Fund in order to recoup the losses due to paying the insurance claim.

### *HUD's Accelerated Claims Disposition Program*

15.     In 2002, HUD began exploring a new demonstration program, known as Accelerated Claim Disposition ("ACD"), to dispose of collateral it received after paying insurance claims.

16.     Since 2002, HUD has operated a number of programs that entail the bulk sale of notes and it has identified such programs by a number of names over time, and by different names at the same time, including: Accelerated Claim Disposition; Accelerated Claim and Asset Disposition; Single Family Joint Venture Loan Sales; Single Family Loan Sales ("SFLS"); Single Family Mortgage Acquisition and Recovery Initiative; and Distressed Asset Stabilization Program.

17.     In October 2002, HUD published a final "Notice of FHA Accelerated Claims Disposition Demonstration" which formally established the Accelerated Claim Disposition ("ACD") demonstration program (the "October 2002 Notice").  67 Fed. Reg. 66,038 (Oct. 29, 2002).

18.     With respect to which loans qualified for the ACD demonstration program, the October 2002 Notice added a requirement that "[t]o the knowledge of the participating mortgagee,

the mortgage loan is not subject to an Indemnification Agreement as of the provisional claim approval date."  67 Fed. Reg. at 66,041.

19.     HUD conducted four sales under the ACD demonstration program, in 2002, 2003, 2004, and 2005.

20.     In June 2006, HUD published an "Accelerated Claim and Asset Disposition (ACD) Program; Advance Notice of Proposed Rulemaking" in the Federal Register (the "June 2006 Proposed Rulemaking").  71 Fed. Reg. 32,392 (June 5, 2006).

21.     The June 2006 Proposed Rulemaking sought "comments on HUD's Accelerated Claim and Asset Disposition (ACD) program before HUD proceeds to issue a proposed rule that will commence the rulemaking process that will result in codification of the requirements for the ACD program, thus making the ACD program a permanent part of HUD's single family mortgage insurance programs."  71 Fed. Reg. at 32,392.

22.     The June 2006 Proposed Rulemaking stated that:

Before implementing the new ACD disposition process on a nationwide basis, HUD has conducted an ACD Demonstration program involving a group of defaulted mortgages.  This has allowed HUD to assess the overall effectiveness of this disposition process.  HUD believes that improvements can be made to the program to make it more effective. Consequently, before proceeding with the regulatory codification of the ACD program, HUD is soliciting comments from all interested parties . . . on possible improvements to the program.

          . . .

This notice solicits comments on HUD ACD Demonstration program before HUD issues a proposed rule to codify the requirements for the ACD program.  When codified, the ACD program will become a permanent part of HUD's single family mortgage insurance programs.

71 Fed. Reg. at 32,392.

23.     The June 2006 Proposed Rulemaking further stated that:

Also upon codification, the current regulations in 24 CFR part 203 governing the assignment of mortgages to HUD and related claim procedures will be amended to

reflect the new requirements for assignments made pursuant to the ACD program. The proposed rule would also revise 24 CFR part 291, which governs the disposition of HUD-acquired single family property, to incorporate the policies and procedures for the sale of loans assigned to HUD under the ACD program.

71 Fed. Reg. at 32,392.

24.     In March 2007, the proposed rulemaking was withdrawn.     *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=200704&RIN=2502-AI14     (last visited Mar. 10, 2020).

25.     HUD did not amend the regulations at 24 CFR part 203 and 24 CFR part 291 to reflect the impacts or changes as a result of the ACD demonstration program.

26.     In July 2017, the HUD Office of Inspector General ("HUD OIG") released a report finding that HUD was required to conduct notice and comment rulemaking to implement the SFLS/DASP program, but had failed to do so.  HUD OIG Report No. 2017-KC-0006, July 14, 2017, available at: https://www.hudoig.gov/sites/default/files/documents/2017-KC-0006.pdf (last visited Mar. 12, 2020).

27.     In response to the HUD OIG Report, HUD claimed in its response letter that the bulk note sales were "guided by a series of well documented procedures used both internally by staff and externally by stakeholders."  *Id.* at 10-11.  HUD did not dispute HUD OIG's conclusion that HUD had failed to conduct the requisite notice and comment rulemaking in connection with the ACD/SFLS/DASP program.  *Id.*

28.     On May 6, 2019, HUD published an Advance Notice of Proposed Rulemaking seeking comments on the SFLS Program.  84 Fed. Reg. 19,748.  While comments were due by July 5, 2019, HUD has yet to take any further action on rulemaking with respect to the SFLS.

### *ACD/SFLS/DASP Is Contrary to HUD's Regulations Governing Note Sales*

29.     Payment of insurance claims, assignment of collateral to HUD in exchange for payment of insurance claims, and mortgage servicing for such properties are generally covered by HUD's regulations at 24 C.F.R. § 203, Subparts B & C.

30.     HUD's disposition of mortgage notes it receives in exchange for paying insurance claims are generally governed by HUD's regulations at 24 C.F.R. § 291, Subpart D.

31.     The ACD demonstration program, which applied to note sales between 2002 and 2005, was subject to notice and comment rulemaking procedures, and could therefore operate outside of the normally-applicable HUD regulations for payment of insurance claims, assignment of collateral to HUD in exchange for payment of insurance claims, mortgage servicing for such properties, and disposition by HUD of mortgage notes it receives in exchange for paying insurance claims.

32.     Subsequent ACD/SFLS/DASP sales starting in 2010 which were not part of the ACD demonstration program were not subject to notice and comment procedures.  *See* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/comp/asset/sfam/sfls     (last visited Mar. 10, 2020) (copy attached as Ex. 2) (HUD separately lists the sales prior to 2010 under the heading "Sales under the ACD Demonstration").

33.     ACD/SFLS/DASP sales which were not part of the ACD demonstration program could not legally operate outside of the requirements of HUD's regulations.

34.     The procedures and requirements of the ACD/SFLS/DASP note sales do not comport with the applicable requirements of 24 C.F.R. § 203, Subparts B & C and 24 C.F.R. § 291, Subpart D.

35.     For example, when a mortgage defaults, the mortgagee normally must first recover the collateral (*e.g.*, foreclosure, obtain a deed in lieu of foreclosure) or change the status of the mortgage (*e.g.*, forbearance, modification, refinance, assumption) before making a claim.   24 C.F.R. § 203.355.  ACD/SFLS/DASP negates this regulation.

36.     As another example, HUD normally may only accept assignment of a mortgage note (as opposed to conveyance of the property) in limited, specified circumstances.  24 C.F.R. § 203.350.  ACD/SFLS/DASP negates this regulation.

37.     As another example, the requirements HUD places on buyers and servicers after the bulk note sale are inconsistent with and more onerous than the requirements provided for under HUD's regulations.  24 C.F.R. § 291.307.

### *AMB's Indemnification Agreement with HUD*

38.     On December 10, 2012, AMB entered into an indemnification agreement with HUD in connection with a HUD audit of an individual mortgage loan originated by AMB, FHA Case No. 374-5838647 (the "Loan").  A copy of the Indemnification Agreement is attached as Exhibit 3.

39.     Among other things, the Indemnification Agreement states:

> ***All HUD requirements for servicing and payment of mortgage insurance premiums will be observed with respect to such mortgages***.  In the event of a ***valid*** claim for insurance on any of the mortgages covered by this Agreement, indemnification will be in accordance with paragraph (b), (c), (d), or (e), whichever applies.  HUD's Investment includes, but is not limited to: the full amount of the insurance claim actually paid, . . . ***prorated losses from and expenses associated with the sale of a note***, . . . and any other expenses HUD may incur in connection with its claim disposition programs regarding FHA insured mortgages. To the extent HUD recoups any losses (e.g. receipts for the sale of the property) or ***there is any discount on the property*** (e.g., an Officer Next Door discount), HUD will deduct the amount of the recoupment or discount from HUD's Investment.
>
> . . .

[Paragraph (c)] Where a HUD/FHA insurance claim has been paid in full and ***the property*** has been sold by HUD to a third party, the amount of indemnification is HUD's investment as defined in paragraph (a), minus the sales price of ***the property*** to be paid in accordance with the terms of an invoice or bill the Department sends to the mortgagee. . . .

[Paragraph (d)] In any other case where a HUD/FHA insurance claim ***is pending or has been paid***, the mortgagee shall pay HUD the amount of HUD's Investment in accordance with the terms of an invoice or bill the Department sends to the mortgagee.

Ex. 3, at 1 (emphasis added).

40.     Attached to the Indemnification Agreement was a list of "Mortgages Covered By This Indemnification Agreement," which included the Loan.  Ex. 3, at 2.

41.     The attachment page also had a second section stating: "Of the mortgages covered by this indemnification agreement, the Department is aware that the following mortgages have a ***claim pending***," and also listed the "Known Claim Amount."  Ex. 3, at 2 (emphasis added).

42.     The Loan was not identified as having a "claim pending" when the Indemnification Agreement was signed in 2012.  Ex. 3, at 2.

### *Sale of the Note Underlying the Loan*

43.     Loans which are subject to indemnification agreements are not supposed to be sold as part of the SFLS bulk note sales.

44.     The Participating Servicer Desk Guide ("Desk Guide") – a document specifically identified by Susan Betts, the HUD Deputy Assistant Secretary for Finance and Budget, as one of the "well documented procedures used both internally by staff and externally by stakeholders" – did not allow for the sale of loans with Indemnification Agreements to be included in bulk note sales.  A copy of the SFLS Participating Servicer Desk Guide for SFLS 2013-2 is attached hereto as Ex. 4.

45.     The Desk Guide "discusses all phases of the SFLS Program, including the processes and timeframes applicable to the various phases of the SFLS Claim Identification process for eligible Mortgage Loans through the reporting requirements."  Ex. 4 at 1-1.

46.     The Desk Guide states that one of the eligibility criteria for the FHA SFLS Program is that the "Mortgage Loan is not subject to an Indemnification Agreement."  Ex. 4 at 2-2.

47.     The Desk Guide states that "Mortgage Loans for which HUD has Indemnification Agreements identified in its system of records will not be issued a SFLS Claim Identification Date."  Ex. 4 at 3-2.

48.     The Desk Guide states that the servicer may only submit an SFLS Claim if the Mortgage Loan has been given an SFLS Claim Identification Date.  Ex. 4 at 5-1.

49.     The Loan as issue here was identified in HUD's system of records as having an indemnification agreement in place prior to the date of the 2013-2 SFLS; accordingly, no SFLS Claim Identification Date should have been issued by HUD, nor should the servicer have filed an SFLS Claim for the Loan.

50.     Unbeknownst to AMB, and contrary to existing HUD regulations as well as HUD's policies and procedures as set forth in the Desk Guide, HUD sold the note that was secured by the collateral for the Loan through the SFLS 2013-2 sale that occurred in June 2013.

51.     HUD requires the servicer for a loan subject to an SFLS sale to obtain a broker price opinion for the property underlying the loan in advance of the sale.

52.     Prior to the sale, the servicer determined that the value of the property underlying the Loan was $550,000, as of April 21, 2013.

53.     AMB obtained a valuation of the property underlying the Loan on September 13, 2013 which placed its value at $530,100.

54.     At the time of the SFLS sale, the Loan had an unpaid principal balance of less than $475,000.00.

55.     At the time of the SFLS sale, the value of the property underlying the Loan was greater than the unpaid principal balance, such that a sale of the property at the value as determined in the broker price opinion would have covered the defaulted loan balance.

### *The Note Was Not Sold at Market Value or to Maximize Value*

56.     Notes sold as part of SFLS bulk sales are subject to conditions and restrictions which are not normally present in open-market sales.

57.      As HUD explains on its website, "[t]he loans sold contain specified representations and warranties and may be sold with post-sale restrictions and/or reporting requirements." *See* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/comp/asset/sfam/sfls   (last visited Mar. 10, 2020).

58.     Bidders for SFLS 2013-2 (which included the note underlying the Loan) were required, among other provisions, to:

> a.     Be a company, trust, or other type of business entity with a net worth of at least $5,000,000;
>
> b.     Be in the business of buying, originating, or selling mortgage loans or similar assets in the ordinary course of business; and
>
> c.     Be able to bear the risk of a complete loss of the economic value of the notes they purchases as part of the bulk sale.

Ex. 5, at 3-4 (SFLS 2013-2 Qualification Statement).

59.     Further, the bidder for a pool had to be able and willing to purchase a large number of assets (*e.g.*, thousands of mortgage notes), and purchasers interested in an individual property, such as the property that is the collateral for the Loan, were excluded from bidding.

60.     The program imposes post-sale restrictions on the property, which include allowing the original borrower to remain in residence for at least six months or one year (depending on when the sale occurred) while evaluating a second round of loss mitigation options.

61.     The restrictions on who could bid, and the post-purchase restrictions on what could be done with the properties, resulted in a reduction in the sales price compared to what HUD could have obtained if it had sold the collateral on the open market or had sought to maximize value.

### *Mortgage Servicing and Insurance Claims for SFLS Mortgages*

62.     To become a HUD-approved mortgage servicer for SFLS loans, the servicer must enter into a Participating Servicer Agreement ("PSA") with HUD.

63.     JPMorgan Chase Bank, N.A. ("JPMorgan") entered into a PSA with HUD in connection with SFLS 2013-2, the sale which covered the note securing the Loan.  Ex. 6 (PSA between HUD and JPMorgan for SFLS 2013-2).

64.     Under the PSA, HUD only pays an insurance claim for an "Eligible Mortgage Loan."  Ex. 6 at 9.

65.     "Eligible Mortgage Loan" is defined, in relevant part, as "a single-family mortgage loan which meets all of the following requirements as of the date of SFLS Claim Submission Report-A (unless explicitly excepted), and continues to meet all such requirements as of the Claim Submission Date: . . . (h) the Mortgage Loan is not subject to an Indemnification Agreement."  Ex. 6, at 9.

66.     With respect to "Filing and Payment of Insurance Claims," the PSA provides:

The Participating Servicer shall review its entire portfolio of FHA insured loans and, for each *Eligible Mortgage Loan* that the Participating Servicer intends to submit as an Insurance Claim, obtain a [risk score] prior to the submission of the initial SFLS claim submission report ("SFLS Claim Submission Report-A"). [Then] Participating Servicer shall submit SFLS Claim Submission Report-A to HUD with a list of *Eligible Mortgage Loans* it intends to submit as Insurance Claims. All of the information required for the SFLS Claim Submission Report, including the submission procedures and the data format for the list of *Eligible Mortgage Loans* submitted and the Participating Servicer Program Eligibility Certification is set forth in Appendix 3 to the Desk Guide.

Ex. 6 § 2.01 (emphasis added).

67.    Next:

[A]fter Participating Servicer's submission of the SFLS Claim Submission Report pursuant to Section 2.01, the list of *Eligible Mortgage Loans* shall be updated on FHA's claim processing system ("FHA System") to allow for claim payment, and HUD will advise Participating Servicer of those *Eligible Mortgage Loans* designated in the FHA System with an SFLS Claim Identification Date by electronic transmittal of an SFLS claim identification report ("SFLS Claim Identification Report") to Participating Servicer. HUD's identification process will be used only to identify mortgage loans submitted as potential SFLS Claims by Participating Servicers and not to screen mortgage loans for eligibility, *with the exception of mortgage loans subject to an Indemnification Agreement*. Without limiting Participating Servicer's obligations in Section 4.0l(b), *HUD will not issue an SFLS Claim Identification Date for any mortgage loans for which Indemnification Agreements are identified on HUD's system of records*.

For *Eligible Mortgage Loans* that received a SFLS Claim Identification Date, the cut-off date for submission of a claim is no later than August 30, 2013. In the event, after an SFLS Claim Identification Date is issued, a mortgage loan *is not or has failed to continue to be an Eligible Mortgage Loan, Participating Servicer shall not submit a claim on such mortgage loan*.

Ex. 6 § 2.02 (emphasis added).

68.    Finally, "[a]n Insurance Claim may be submitted by Participating Servicer for any *Eligible Mortgage Loan* provided that the Participating Servicer has received an SFLS Claim Identification Date prior to submission of an SFLS Claim with respect thereto." Ex. 6 § 2.03 (emphasis added).

### *No Valid Insurance Claim on the Loan*

69.     HUD tracks information about FHA-insured loans in a software program known as Neighborhood Watch.

70.     Both HUD and JPMorgan had access to information about the Loan in Neighborhood Watch.

71.     Since the Indemnification Agreement between HUD and AMB was signed in December 2012, the Loan was not an "Eligible Mortgage Loan" for purposes of making an insurance claim under the PSA by 2013.

72.     JPMorgan made an insurance claim on the Loan on August 6, 2013, for $520,979.86.

73.     The Loan was identified in Neighborhood Watch as being subject to an Indemnification Agreement.  Ex. 7, at 3.

74.     Both HUD and JPMorgan failed to screen out the Loan as ineligible for an insurance claim due to the presence of the Indemnification Agreement, despite the clear obligation on the part of both parties to do so.

75.     HUD paid the insurance claim of $520,979.86 to JPMorgan on August 10, 2013.

76.     Since JPMorgan was barred from making the insurance claim due to the Loan not being an "Eligible Mortgage Loan," the claim for insurance was not valid.

77.     John W. Lucey, Director of HUD's Asset Sales Office testified that JP Morgan should ***not*** have filed a claim for insurance for the Loan and he confirmed that the note for the Loan should ***not*** have been included in the SFLS.

78.     HUD paid a non-valid claim for insurance in connection with the Loan.

79.     The Indemnification Agreement required that "[a]ll HUD requirements for servicing . . . will be observed with respect to" the Loan.

80.     The prohibition on making an insurance claim for indemnified loans was a requirement for servicing with respect to the Loan.

81.     HUD breached the Indemnification Agreement by failing to follow all HUD servicing requirements.

82.     The Indemnification Agreement requires the parties to the agreement to follow "all HUD requirements for servicing," and AMB to identify HUD only for losses paid on a "valid insurance claim." Ex. 3, at 1.  Accordingly, AMB is not required to indemnify HUD in connection with the Loan.

### *HUD Sold the Note at a Discount*

83.     HUD has regularly stated that notes sold as part of the SFLS bulk sales were sold at a discount.

84.     For example, in a report on the bulk note sale program, HUD repeatedly stated that it sold the notes that were part of the program "at a discounted price" and at a "discount."  Ex. 8, at ii, iii, 1, 3, 11, 18.

85.     As another example, in a different report, HUD OIG stated that HUD "sells the note to a joint venture at a discounted price."  Ex. 9, at 5.

86.     As another example, a HUD press release announcing DASP stated that "[t]he investor purchases the loan at a discount."  Ex. 10, at 1.

87.     The property underlying the Loan had a value of $550,000 pursuant to a valuation HUD required the mortgage servicer to obtain on the property as a precondition to including it in the bulk note sale.

88.     HUD sold the note for $360,531.24 or approximately 66% of the property's value.

89.     Under the Indemnification Agreement, "[t]o the extent HUD recoups any losses (e.g. receipts for the sale of the property) or there is any discount on the property (e.g., an Officer Next Door discount), HUD will deduct the amount of the recoupment or discount from HUD's Investment."

90.     The term "*e.g.*" is an abbreviation for the Latin phrase "*exempli gratia*," which means "for the sake of example" or "for example," and is used to introduce representative, non-exclusive examples of something.

91.     While the Indemnification Agreement states that the Officer Next Door program is one example of a "discount," that does not mean that it is the only type of program treated as a discount under the Indemnification Agreement.

92.     In order to save HUD from its own admissions, in his Decision the ALJ adopts the testimony of a HUD witness who characterized HUD's references to a "discount" in connection with the bulk note sale program simply as "bad writing."  Decision at 9.

93.     The ALJ goes further and posits that to qualify as a discount, the reduction must be at "a predetermined or set amount."  Decision at 9.  The ALJ provides no justification for this assertion, which is in direct contravention of the plain language of the Indemnification Agreement which provides that HUD will "deduct the amount" of "any discount" on the sale of the property.

94.     HUD breached the Indemnification Agreement when it did not deduct the amount of the discount resulting from the bulk note sale from what it claims AMB owes under the Indemnification Agreement.

### *The Indemnification Agreement Required HUD to Sell the Property Instead of the Note*

95.    An indemnitee, like HUD, is obligated to reasonably mitigate its damages, and an indemnitor, like AMB, is not responsible to pay for damages which could have been mitigated.

96.    The Indemnification Agreement discussed several scenarios of how HUD could liquidate the collateral it received for paying the insurance claim in order to recoup its loss.

97.    Under the circumstances of this case, HUD was obligated to sell the property underlying the Loan instead of just the note in a bulk note sale which was not permitted under existing HUD regulations.

98.    A provision of the contract which could have allowed HUD to sell just the note was inapplicable since it only applied to insurance claims which were pending or paid at the time the parties entered into the Indemnification Agreement, which was not the case here.

99.    Alternatively, to the extent HUD was allowed to sell the note in a bulk sale – which it was not – HUD was required to "prorate[] losses from and expenses associated with the sale of the note."  Ex. 3, at 1.

100.    HUD did not prorate its losses on the sale of the note notwithstanding the fact that it sold the note at an admitted discount.

### *HUD Seeks Indemnification from AMB*

101.    HUD did not seek to collect under the Indemnification Agreement with AMB after it paid the claim in August 2013.

102.    During or before mid-July 2014, the HUD OIG informed HUD that HUD OIG believed HUD had failed to collect under indemnification agreements related to loans which were sold as part of the SFLS program and for which an insurance claim was made.  HUD OIG Report

No. 2014-LA-0005, Aug. 8, 2014, available at: https://www.hudoig.gov/sites/default/files/documents/2014-LA-0005.pdf (last visited Mar. 12, 2020)

103. On July 28, 2014, as a result of the HUD OIG's prompting, HUD sent AMB a Demand Notice for $160,448.62, the difference between what HUD paid for the insurance claim and what it allegedly received from the bulk note sale for the Loan.

104. On October 13, 2014, HUD issued a Notice of Intent to Collect by Treasury Offset for the alleged amount owed of $161,897.31 (the amount owed had accrued alleged interest).

105. In a December 2014 letter between HUD and AMB regarding the alleged amount owed, HUD admitted that it "acknowledges that the indemnified loan was erroneously included in the Single Family Loan Sale (SFLS) Program," but still demanded payment.  Ex. 11.

106. In the December 2014 letter, HUD claimed that inclusion of the Loan in the SFLS program "did not impact on the legal enforceability of the Indemnification Agreement," but did not proffer any basis for the assertion, nor attempt to explain why HUD used a sales process which recovered only 66% of the value of the underlying property for an intentional loss.  Ex. 11.

### *HUD Attempts to Collect by Administrative Offset*

107. Treasury offset, also known as administrative offset, is a procedure in which the Government recoups money it is allegedly owed by withholding money which belongs to the alleged debtor that is in the Government's possession or which the Government is otherwise obligated to pay to the alleged debtor.  31 U.S.C. § 3716.

108. When HUD seeks to collect a debt through administrative offset, it must provide "an opportunity for a review within the agency of the decision of the agency related to the claim." 31 U.S.C. § 3716(a)(3).

109.    Under HUD regulations, an alleged debtor "who receives notice of intent to offset . . . has the right to a review of the case and to present evidence that all or part of the debt is not past due or not legally enforceable."  24 C.F.R. § 17.69(a).

110.    The administrative proceeding is presided over by a HUD Administrative Judge.

111.    "The decision of an administrative judge of the [HUD Office of Appeals] will be based on a preponderance of the evidence as to whether there is a debt that is past due and whether it is legally enforceable."  24 C.F.R. § 17.69(c).

112.    "The decision of the administrative judge of the [HUD Office of Appeals] concerning whether a debt or part of a debt is past due and legally enforceable is the final agency decision with respect to the past due status and enforceability of the debt."  24 C.F.R. § 17.73(a).

113.    In normal situations where one entity alleges that another entity owes it money, the alleged creditor is generally required to file a court case and obtain a judicial judgment that the alleged debtor owes the money.

114.    The alleged creditor can then collect the money owed through the court's judgment.

115.    With administrative offset, HUD is able to short-circuit the normal requirement of going to court and obtaining a court judgment before it can begin collecting money which it is allegedly owed.

### *Administrative Proceedings Before HUD*

116.    On December 17, 2014, AMB filed a timely agency appeal with HUD's Office of Hearings and Appeals of HUD's decision to seek administrative offset.

117.    On December 17, 2014, the Administrative Judge assigned to the case issued a stay of the administrative offset pending a final decision on AMB's appeal.

118. After an administrative process that lasted almost exactly two years, the HUD Administrative Judge issued a Decision and Order on December 16, 2016.

119. The HUD Administrative Judge found the debt to be legally enforceable against AMB and vacated the prior stay of HUD's collection by administrative offset.

120. AMB appealed the Administrative Judge's Decision to the United States District Court for the District of Columbia, Case No. 17-00075-ESH.

121. Ultimately, the District Court vacated the Administrative Judge's December 16, 2016 decision and remanded the case for further proceedings, ruling that pursuant to the Supreme Court's decision in *Lucia v. S.E.C*, 138 S. Ct. 2044 (2018), the Administrative Judge who issued the decision was not properly appointed under the U.S Constitution's Appointments Clause. Mem. Op. No. 17-0075-ESH, 2019 U.S. Dist. LEXIS 1603 (Jan. 4, 2019, D.D.C.).

122. On February 28, 2020, on remand, a HUD ALJ issued his decision rejecting in full all of AMB's arguments and finding that the alleged debt is past due and legally enforceable and vacated the prior stay of HUD's collection by administrative offset. Decision at 19.

123. While purporting to analyze the Indemnification Agreement, the ALJ completely disregarded the plain language of that Agreement. In particular, the ALJ completely ignored the requirement of a "valid claim," instead rejecting the qualifier of "valid" as "a technicality" thereby rendering the provision superfluous and twisting the plain language of the Indemnification Agreement into a tautological circularity. Decision at 16 ("But the term "valid," as used in the Indemnification Agreement, cannot be synonymous with the PSA' s use of the term "eligible," because under the PSA, an "Eligible Mortgage Loan," by definition, excludes any loan that is subject to an indemnification agreement.").

124.     The ALJ committed a clear error of law in rejecting the well-established legal principle that ambiguity in the Indemnification Agreement – a contract between AMB and HUD – "should be construed most strongly against the drafter, which in this case was the United States." *United States v. Seckinger*, 397 U.S. 203, 210 (1970).  Rather, in the ALJ's opinion, the language and terms at issue "suggest that the 'valid' insurance claim is simply one that was brought about by Petitioner's origination of the Springer loan[.]"  Decision at 16.  The ALJ's interpretation, which he characterizes as "HUD's preferred construction," is contrary to law and completely eviscerates a plain requirement of the Indemnification Agreement.

125.     In permitting the Loan to be part of the 2013-2 SFLS, HUD breached the requirement in the Indemnification Agreement that "[a]ll HUD requirements for servicing and payment of mortgage insurance premiums will be observed."  Ex. 3, at 1.

126.     The ALJ's statement that "[a]s drafter of the Indemnification Agreement, HUD likely intended to bind only the indemnitor," Decision at 14, demonstrates the extent to which the ALJ substituted his bias against AMB since there is no evidence in the record supporting such an "intent" on the part of the Agency.

127.     The HUD Administrative Judge's Decision that the debt was due and enforceable, and that it could be collected by administrative offset, was contrary to the plain language of the Indemnification Agreement and not based on substantial evidence.

### ***Harm to AMB and Class Members***

128.     HUD's failure to properly screen the mortgage loans that the servicer has included in the bulk note sale is inexcusable and resulted in serious damage to AMB and the putative class.

129.     Among other things, by selling the Loan, as well as other loans subject to indemnification agreements, as part of the SFLS program, HUD breached the terms of the indemnification agreements it executed with lenders.

130.     The indemnification agreements contemplate that HUD will exercise reasonable business judgment in liquidating the collateral, which generally requires sale of the collateral that maximizes its value and minimizes HUD's loss.

131.     The indemnification agreements also contemplated that HUD would follow existing regulations, which HUD did not do because the SFLS program was not authorized under HUD regulations.

132.     Pursuant to the terms of the Indemnification Agreement, HUD was required to sell the collateral, *i.e.,* the home, and then seek recovery for its losses, if any remained, from AMB.

133.     Instead, HUD sold the note for the Loan as part of a pool in a process that necessarily reduced the amount of HUD's recovery by excluding potential bidders and placing non-standard restrictions and conditions on the note buyer's handling of the loan after the sale.

134.     HUD's reckless and intentional disregard of its obligations and its own rules caused financial injury to AMB, as well as to other lenders, and the agency's conduct breached the indemnification agreements HUD executed with AMB and other lenders.

## CLASS ALLEGATIONS

135.     AMB seeks to represent a class of mortgage lenders (the "Lender Class") who executed indemnification agreements on loans that were improperly included in the various note sale programs either through the SFLS or some other accelerated disposition program.

136.     HUD's complete failure to properly screen the loans identified by servicers to remove those loans with indemnification agreements was widespread.

137.     On August 8, 2014, HUD OIG issued a Report of its audit of HUD's indemnification recovery process for single-family loans.  HUD OIG determined that there were "243 loans that were part of the ACD program from January 1, 2004, to February 21, 2014, that had indemnification agreements; however, HUD did not evaluate any of these loans for billing." HUD OIG Report No. 2014-LA-0005 at 5.  According to the Report, the losses on those loans exceeded $22 million.

138.     The HUD OIG Report specifically identifies the Loan, FHA Case No. 374-5838647, as one of the loans for which HUD had not "billed" the lender because the loan was sold through the ACD program.  HUD OIG Report No. 2014-LA-0005, at 29.

139.     The fact that the HUD OIG conducted the audit and admonished HUD's Office of Finance and Budget for its failure to seek recovery in those situations where HUD sold the loan through an SFLS explains why HUD did not seek recovery from AMB until July 2014 when, in fact, the Agency sold the note in or around June 2013.

140.     The July 2017 HUD OIG Report also found that HUD had failed to use notice and comment rulemaking procedures before adopting policies and procedures governing the SFLS program, a point which HUD did not dispute when given an opportunity to respond to an advance copy of the Report.  HUD OIG Report No. 2017-KC-0006, at 10-11.

141.     On information and belief, members of the Lender Class received a Notice of Intent to Collect by Treasury Offset substantially identical in form to the one sent to AMB.

142.     HUD did not alert the Lender Class that HUD breached its own policies and regulations regarding the disposition of the loans or that it breached the plain language of the indemnification agreements.

143.     The Lender Class has no way of uncovering HUD's reckless and/or willful disregard of its own policies unless they individually undertook their own substantial investigation.

144.      The members of the Lender Class have been injured to the same extent as AMB, to wit, the amount of purported debt each class member purportedly owes HUD has been significantly increased because HUD violated its own procedures by including loans in SFLS that were subject to indemnification agreements, and violated its own regulations by selling notes in the ACD/SFLS/DASP bulk sales.

145.     Upon information and belief, some members of the Lender Class have paid the amounts demanded by HUD.

146.     HUD's conduct towards the Lender Class was identical, and each member of the Lender Class was harmed in an identical fashion; thus, this case is amendable to class treatment pursuant to Rule 23, Rules of the United States Court of Federal Claims ("RCFC").

147.      Pursuant to RCFC Rules 23 (a) and 23(b)(2), (3), AMB seeks certification of the following class:

> All mortgage lenders who executed an indemnification agreement with HUD in connection with one or more loans and where the loans were subsequently included in an SFLS or other ACD at any time prior to final judgment in this action.

148.      AMB will adequately represent the interest of the Lender Class.

## DAMAGES

149.     The Decision lifted the previously-entered stay of Treasury's ability to withhold money which belongs to AMB that is in the Government's possession or which the Government is otherwise obligated to pay to AMB.  31 U.S.C. § 3716.

150.     On information and belief, Treasury has or will withhold monies that are owed to AMB as permitted under the offset statute.  Treasury is not obligated to advise AMB in advance

when it intends to seize funds pursuant its offset authority, such that without an accounting from Treasury, AMB cannot provide an accurate damage calculation at this time.

151.     On information and belief, many members of the Lender Class have paid HUD under indemnification agreements that were breached by HUD in the manner set forth above, or were subject to administrative offset, and were damaged by the amounts they paid or which were withheld by the Treasury.

## COUNT I

### Breach of Contract

152.     AMB incorporates the allegations in the entirety of this Complaint as if fully stated herein.

153.     HUD materially breached the Indemnification Agreement by:

    a.   Selling the Note in a bulk note sale;

    b.   Paying an invalid claim and then requiring AMB to perform by reimbursing HUD for the entire amount of the invalid claim;

    c.   Failing to comply with the requirement of the indemnification agreement that all HUD requirements for servicing will be observed;

    d.   Failing to properly discount or prorate the amount sought by HUD as indemnification;

    e.   Improperly utilizing subsection 1.d) of the indemnification agreement to dispose of the collateral because at the time the Indemnification Agreement was executed, the claim for the Loan was not "pending," nor had it been "paid."

154.    HUD's material breach of the indemnification agreement renders the contract unenforceable against AMB and the Lender Class, and has damaged AMB and the members of the class.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing

155.    AMB incorporates the allegations in the entirety of this Complaint as if fully stated herein.

156.    The indemnification agreement is a contract between HUD and the lender.

157.    There is a duty of good faith and fair dealing implied in every contract.  It is not necessary to breach an express contractual provision in order to breach the implied duty of good faith and fair dealing.

158.    A party to a contract—including the government—must do everything that the contract presupposes should be done to accomplish the contract's purpose so as to not destroy the reasonable expectations of the other party regarding the fruits of the contract.

159.    HUD breached its implied duty through a lack of diligence and/or willful disregard of its contractual obligations by failing to screen the list of loans provided by the servicers to remove those loans with an indemnification agreement.

160.    HUD breached the implied duty of good faith and fair dealing by conducting bulk note sales when it lacked the statutory and regulatory authority to do so.

### PRAYER FOR RELIEF

161.    WHEREFORE, AMB respectfully requests that this Court:

   a.    Declare that HUD violated the Indemnification Agreement that was executed in connection with the Loan, FHA Case No. 374-5838647;

b.  Enjoin HUD from collecting any additional funds pursuant to administrative offset and/or referring the debt to Treasury for collection;

c.  Certify this matter as a class action;

d.  Issue a preliminary injunction restraining HUD, its officers, employees, agents, or servants from taking any actions against AMB, or the Lender Class, with respect to loans where there was an existing indemnification agreement in place and HUD subsequently included the loan in an ACD/SFLS/DASP sale;

e.  Return funds improperly collected by HUD pursuant to indemnification agreements which are held in the MMI Fund;

f.  Award AMB its attorney's fees and expenses incurred in this action; and

g.  Grant such other relief as the Court deems just and proper.


Dated:  March 27, 2020

       /s/ David M. Souders
David M. Souders
Brian M. Serafin (*admission application pending*)
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036
Tel:  (202) 628-2000
Fax:  (202) 628-2011
Email:  souders@thewbkfirm.com
        serafin@thewbkfirm.com


***Counsel for Plaintiff and the class of similarly situated mortgage lenders***